[No. 5350.]

## BRADY v. FLORENCE & CRIPPLE CREEK RAILWAY COMPANY.

1. **Bills of Exception—Averments—**On error assigned that the court below directed a verdict for the defendant, an averment, "Here the said plaintiff rested his case," was equivalent to an averment that the testimony set forth is all the testimony that was presented.—P. 286.

2. **Master and Servant—Contributory Negligence of Servant** —That the servant adopts the more dangerous method of performing a duty does not convict him of contributory negligence, if he is not disobeying instructions, and the method adopted is one which, under the same circumstances, might have been adopted by a reasonably prudent man.—P. 288.

A servant is not negligent in assuming that every other servant will observe the rules of the service.—P. 291.

3. **Evidence — Res Gestae —** An involuntary exclamation, uttered by an injured person at the instant of receiving the injury, is res gestae.—P. 290.

4. **Negligence—Directing Verdict—**Where the testimony is in conflict, and upon any reasonable view of it the plaintiff may be acquitted of contributory negligence, it is error to direct a verdict for the defendant.—Pp. 291, 292.

5. **Presumptions—**One in charge of the engine of a regular train, operating and controlling it, is presumptively an employee of the railway company.—P. 292.

*Error to Teller District Court.*
*Hon. William P. Seeds, Judge.*

Mr. J. J. McFEELY, Mr. JOHN H. REDDIN, and Mr. J. R. ALLPHIN, for plaintiff in error.

Mr. HENRY M. BLACKMAN and Messrs. SCHUYLER & SCHUYLER, for defendant in error.

This action was brought under what is known as the co-employees' liability act of 1893. Plaintiff's husband, John Brady, was employed by defendant on one of its suburban trains in the Cripple Creek district. The complaint in substance charges that without negligence on his part the said Brady met

his death through the negligence of a conductor and
engineer operating another of defendant's trains.

At about 5:30 p. m. on the 15th of July, 1899,
defendant's train No. 37, upon which Brady was
braking, headed in on the south leg of the "Y" at
Cripple Creek station and stopped on a sharp curve
of between 25° and 30°. Another train, No. 38, was
waiting on the main line at the station for the pur-
pose of taking one or two coaches from the rear end
of No. 37. The custom of so doing had for a long
time previous been in force, and deceased was aware
of this custom.

It became necessary, of course, to uncouple the
coaches so to be removed from the rest of train 37,
and also to separate or uncouple the connecting air-
hose, which Brady proceeded to do. In accomplish-
ing the latter act he stepped from the platform to
the ground and entered between the cars on the in-
side of the curve. In the meantime train No. 38 had
steamed to the switch and was backing upon the "Y"
to connect with the cars to be removed. And while
Brady was under the platform, endeavoring to un-
couple the airhose, the engineer in charge of 38
backed into the rear of 37, causing a sufficient move-
ment of the latter train to catch Brady and inflict
upon him the injuries from which he died a few hours
later. The contact of the rear coach on 38 with the
last coach on 37 was unexpected and with consider-
able force. Immediately after such contact, Brady
partly rose up and fell backward exclaiming: "My
God! What did you back up until I told you to,
for?"

The cause was tried to a jury, but, upon the close
of plaintiff's testimony, the court directed a verdict
in favor of defendant. To review the judgment en-
tered upon this verdict the present writ of error is
prosecuted.

The section of the statute under which the action is brought reads, *inter alia,* as follows:

"Section 1.   Where   *   *   *   personal injury is caused to an employee, who is himself in the exercise of due care and diligence at the time;   *   *   * (3) By reason of the negligence of any person in the service of the employer who has the charge or control of any switch, signal, locomotive, engine or train upon a railroad—the employee, or in case the injury results in death, the parties entitled by law to sue and recover for such damages, shall have the same right of compensation and remedy against the employer, as if the employee had not been an employee of or in the service of the employer or engaged in his or its works."

The bill of exceptions contains the following:

"Be it remembered, that on the 4th day of February, A. D. 1903, that being one of the juridical days   *   *   *   said cause came on to be heard before a jury; that on the trial of said cause on said day, the plaintiff and defendant, to maintain the issues joined on their respective parts, introduced and offered before said court and jury the following oral and documentary evidence," etc.

It shows that plaintiff then proceeded to offer her testimony, and at the close thereof is the following recital:   "And thereupon the plaintiff rested her case."   And immediately following are the directed verdict and the judgment pronounced thereon.

All other necessary or material matters sufficiently appear in the opinion.

Mr. JUSTICE HELM delivered the opinion of the court:

A preliminary objection to the present review is urged upon the ground that there is no certificate of the trial judge that the bill of exceptions contains all

the evidence introduced upon the trial. It is true that the bill does not expressly state, nor does the judge expressly certify, that all of the evidence introduced is so incorporated. But *Spangler v. Green*, 21 Colo. 505, is, we think, decisive upon this question. Under the ruling in that case the language employed in the present bill of exceptions is sufficient in this particular.

At the conclusion of plaintiff's testimony the jurors were, on motion, directed to return a verdict for defendant. They were not given an opportunity to exercise their volition or consider the evidence.

The main questions, therefore, to be determined by us are: Was there no evidence then before the trial court upon which the jury might reasonably have found negligence on the part of the engineer operating train No. 38? Or, did the evidence of plaintiff herself so conclusively show contributory negligence by Brady as to justify that court in taking the case, upon this ground, from the jury?

There is evidence strongly tending to show that no bell was rung or whistle blown or other signal given by the engineer in charge of No. 38 before backing into No. 37. There is also evidence tending strongly to show that the trains came together with considerable violence—as one witness describes it, "with a sudden jerk" which threw her violently about the car platform till she was caught by a friend who had grasped one of the brakes; the suddenness and violence of the contact were certainly sufficient to catch Brady and crush him to death. The engineer of No. 38 knew that No. 37 had but a moment before headed upon the "Y," and that it was necessary not only to uncouple the cars to be taken off, but also to uncouple the airbrake or airhose connecting them with the remainder of the train. And inasmuch as such uncoupling of the airbrake necessarily

required the brakeman or some other employee to go between the cars, the engineer should have exercised more caution in making the connection.

There was certainly sufficient evidence to require the submission of this branch of the case to the jury. But the position most strenuously urged on behalf of defendant in error is that contributory negligence on the part of Brady was so fully established by plaintiff's evidence that the court below was justified, on this account alone, in directing the verdict.

There is evidence to the effect that only when a member of defendant's mechanical department was not present did it become the duty of the brakeman upon No. 37 to uncouple the airbrake or hose between the cars to be removed and those remaining; but it is clear that on this occasion no member of the mechanical department was present attempting to perform or ready to perform this duty. There is testimony tending to show that a member of that department was in the vicinity; but the same testimony also tends strongly to show that he was in charge of the "Y" switch about 150 feet away, controlling the movements of the two trains; and if upon this evidence the cause had been submitted to the jury and that body had found that Brady, when he went under the cars, was discharging a duty devolved upon him as brakeman, we would not disturb such finding.

But it is insisted that Brady was negligent in regard to the method employed by him for performing this duty; such negligence consisting in uncoupling the airbrake from the inside instead of from the outside of the curve upon which train No. 37 was standing. In other words, that Brady chose the more dangerous of two methods for performing his duty, and hence assumed all the risk involved in so doing.

Touching the proposition of law thus invoked we

suggest in passing, that the choice of a more dangerous method by the employee does not establish contributory negligence, if, in so doing, he does not disobey instructions or rules, acts in good faith, and the method chosen might have been adopted under like circumstances by a reasonable and prudent man.

There may have been good reason for Brady's selecting the inside of the curve. He was disconnecting the airbrake or hose, he was not uncoupling the cars; the joint in this hose naturally swung toward the inner and lower side of the curve and would be reached therefrom with less difficulty. It is doubtful if Brady could have been caught between the car platforms; the only witness who saw him at the instant testifies that he was on his knee underneath bending down and grasping the airhose at the joint with both hands; just what portion of the cars or apparatus connected therewith caught and crushed him, does not appear. Moreover, in reaching and disconnecting the hose from the upper side of the curve, he would have been required to place himself in a position scarcely less dangerous; for in that event he would have been compelled to go between the cars and under the platforms; as the very nature of the device constituting the airbrake made this act a necessity.

The material facts among the foregoing are very different from those presented in *Gilbert v. Burlington C. R. & N. Ry. Co.*, 128 Fed. 532; *Tuttle v. Detroit G. H. & M. Ry. Co.*, 122 U. S. 189, and certain other cases cited and relied on by counsel for defendant in error. There the injuries were suffered by brakemen who were engaged in uncoupling cars; they were not separating the airhose. In several of those cases this uncoupling could have been made from the top of the car platform by simply moving a lever or "mechanical device" employed to avoid

the necessity for going between the cars at all in coupling or uncoupling the same. And in all of those cases the connecting brake or apparatus could have been quite as easily and effectively reached and handled, by one standing on the ground, from the opposite side of the train. Moreover, in each of those instances the brakeman assumed a greater risk from the fact that in discharging the duty by going between the cars he necessarily remained in an upright position, where he was in greater danger of being caught and crushed by the projecting platforms and car coupling apparatus; a risk or danger that existed "only on the inside of the curve," when the accident happened upon a curve.

But we prefer to rest our decision upon a broader and more coercive ground than the foregoing. At the instant of the injury, as he rose from his knee and fell backwards, Brady exclaimed: "My God! What did you back up until I told you to, for?" And Sell, the engineer in charge of No. 37, after stating that he had been in the employ of defendant five years, and showing that he was familiar with the method of handling trains, among other things testified:

Q.—"Did you, or was it your duty to, hitch on to cars without you got a signal for the purpose of doing so?" A.—"I just explained that. I didn't move my train without a signal."

Q.—"So that this engine and cars that backed up to take off your cars, if they backed up to do so without a signal that everything was all right, they did that which they hadn't ought to do?" A.— "Suppose duty of engineer and conductors of the train that backed up to rear of my train, before making connection with my train, would be same as mine if I were on there; that they were in same capacity as I was. Suppose same rule would apply to them as to me. They were required to have instructions

and signals given them before they hitched onto my train.''

The last answer of the witness is quoted from the abstract. It is a sufficiently accurate epitome of several questions and answers appearing in the transcript. Besides, its fairness is not challenged by defendant in error.

The foregoing testimony was not contradicted. And we are entitled to assume its correctness for the purposes of this decision. The exclamation of Brady at the instant of the injury and as a part of the *res gestae,* is significant. It indicates, or at least it tends strongly to indicate, that it was not the rule or practice for No. 38 to back into 37 without a final signal so to do; also that the brakeman or employee engaged in uncoupling the cars and airhose on 37 was the person to give such signal. The exclamation ''what did you back up until I told you to, for,'' plainly denotes the accuracy of both of these conclusions. It tends to show that when Brady went under the train to uncouple the airhose he understood No. 38 would come to a full stop before the cars actually came together; and that the engineer of that train would await a signal from him (Brady) before making the actual coupling. The testimony of Sell corroborates this interpretation of Brady's exclamation. He says that the ''rule'' in existence required the engineer on No. 38 to wait for a signal before he ''hitched onto'' No. 37.

The foregoing testimony, if accepted, not only tends to negative the claim of contributory negligence on the part of Brady, but it also tends to establish the negligence of the engineer handling train 38. And in our judgment it is a complete answer to the view urged, that the knowledge that No. 38 was backing upon the ''Y'' for the purpose of removing the two rear cars, necessarily imparted to Brady by the

noise of the moving train together with that of the locomotive steam exhaust, should have warned him against attempting to uncouple the airbrake as he did. In going under the car platforms for this purpose, according to Sell's testimony, Brady practically incurred no risk from his own train, which was standing still. And, as already observed, under the rule and practice apparently prevailing, he incurred no risk from No. 38. For he had a right to assume that the engineer on the latter train would obey the rule and stop before his rear coach came in actual contact with the rear coach on No. 37; also that this engineer would not make such contact until Brady himself gave the signal so to do.

But if Brady had a right to assume that the rules of the company would be obeyed, and if obedience to such rules required No. 37 to remain stationary until a signal was properly given its engineer, and No. 38 not to make a contact with 37 until a corresponding signal was given to the engineer in charge of that train, there was no danger in going under the cars, as he did, to uncouple the airbrake. And of course it would necessarily follow that his act in so doing did not constitute contributory negligence.—*Hewitt v. E. J. L. Co.,* 136 Mich. 110; *R. R. Co. v. Courtney,* 30 Tex. Civ. App. 544.

The rule or practice which the evidence above considered tends to show, is strictly in accord with ordinary prudence and caution, as well as with ordinary common sense. Surely the regulation ought to be, that where it is necessary for a brakeman or other employee, in the performance of his duty, to go under or between cars constituting part of a train, those cars should not be moved while he is performing such duty, without a proper signal in the premises. And it would aid in protecting against accident and injury an employee so engaged, if this signal were

to be given by himself.  We think that the question of Brady's contributory negligence should have been submitted to the jury.

We do not deem it necessary to answer at length counsel's contention that plaintiff offered no proof to show that the individual in charge of the locomotive on No. 38 was an engineer, and employee of defendant.  Undoubtedly, under the statute it devolved upon plaintiff to prove that the injury was occasioned by the negligence of such an employee or servant.  But when, as in this case, it appears by the evidence that the person guilty of the negligence is in charge of an engine upon a regular passenger train and is, without objection or protest, performing the duties of engineer, such proof, in the absence of contradictory evidence, is sufficient.

Railway companies do not allow strangers to usurp the function of engineer and take charge of their passenger trains without license or authority. And if in this instance such a stranger did take possession of the engine on No. 38, it would be very easy for defendant to prove the fact and thus overcome the evidence of plaintiff.

We think this question also should have been submitted to the jury and that, without further proofs, that body could well have resolved it in plaintiff's favor.

Under all the circumstances presented by the record before us, our conclusion is that the court erred in directing a verdict, and that the judgment should be reversed.                    *Reversed.*

Decision *en banc.*

Mr. JUSTICE GODDARD and Mr. JUSTICE BAILEY dissent.  Mr. JUSTICE CAMPBELL not participating in the decision.